UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

DIANNA SCHOTT,                      :
                                    :    NO. 1:12-CV-00918
        Plaintiff,                  :
                                    :
        v.                          :
                                    :    **OPINION AND ORDER**
CAROLYN W. COLVIN,                  :
ACTING COMMISSIONER                 :
OF SOCIAL SECURITY,                 :
                                    :
        Defendant.                  :

This matter is before the Court on the Magistrate Judge's Report and Recommendation (doc. 11), Plaintiff's partial objection thereto (doc. 12) and Defendant's response (doc. 17). In her Report and Recommendation, Magistrate Judge Stephanie K. Bowman recommends that the Commissioner's decision be reversed under sentence four of 42 U.S.C. § 405(g) and remanded to the Commissioner for further review in accordance with Defendant's Motion to Remand (doc. 9). For the reasons that follow, we REJECT the recommended decision of the Magistrate Judge.

In brief, in an opinion dated March 14, 2011 Administrative Law Judge ("ALJ") Gregory G. Kenyon determined that Plaintiff had the severe impairment of degenerative joint disease of the right shoulder (Tr. 23). However, the ALJ also determined that, <u>as of December 31, 2007, her date last insured</u>, Plaintiff was not disabled under the Social Security Act because this impairment

1

did not meet or equal one of the listed impairments in 20 C.F.R. § 404, Subpart P, Appendix 1, specifically Listing 1.02 and that Plaintiff had the residual functional capacity ("RFC") to perform less than the full range of light work (Tr. 23-27). To the point highlighted, the ALJ made this finding:

> There is no doubt that the claimant is currently disabled due to the degenerative changes in her right shoulder. Unfortunately, however, the record does not objectively demonstrate that the claimant's use of her right shoulder was substantially compromised prior to her date last insured for Title II purposes. The claimant's date last insured is December 31, 2007.

(Tr. 27 (emphasis added).) The critical issue decided by the ALJ, therefore, was his determination that Plaintiff was not disabled during the time period from April 15, 2007, her alleged onset date, through December 31, 2007, her date last insured (Tr. 18-30). The Appeals Council denied Plaintiff's request for review, making the decision of the ALJ the final administrative decision of the Commissioner (Tr. 1-6).

Plaintiff sought judicial review in this Court (see doc. 1). Defendant Commissioner has filed a motion in which she asks the Court to reverse her decision denying benefits and to remand the matter back for further administrative proceedings pursuant to sentence four of 42 U.S.C. § 405(g) (doc. 9). As Magistrate Judge Bowman noted (see doc. 11 at 1), voluntary motions to remand made by the Commissioner are infrequent and usually submitted to the Court by joint stipulation of the parties.

Here, however, Plaintiff has opposed Defendant Commissioner's request for remand and instead advocates for a full reversal and thus judgment in her favor (doc. 10 at 23-24). Were the Court to grant the relief Plaintiff seeks, a remand would occur solely for purposes of an award of benefits to her. The Commissioner did not file a memorandum in response to Plaintiff's Statement of Errors and brief in opposition to the motion for voluntary remand.

The Magistrate Judge concluded that remand for further review was appropriate because, although "evidence that [Plaintiff] became disabled <u>at some point</u> prior to her last insured date of December 31, 2007 is very strong, the precise date of disability remains unclear" (doc. 11 at 2 (emphasis original)). It is undisputed that Plaintiff underwent shoulder surgery on May 10, 2007, during which an inter-articular pain pump catheter ("pain pump") was inserted directly into her shoulder joint (<u>see</u> doc. 10 at 1). Plaintiff maintains that this pain pump caused her shoulder cartilage to rapidly deteriorate, a process known as "chondrolysis," and her shoulder joint was totally destroyed (<u>id</u>.). The Magistrate Judge found that there was conflicting evidence as to exactly <u>when</u> this destruction, and concomitant disability, occurred. As a prime example, she observed that a Dr. Hasan opined that pain pump-induced chondrolysis tends to develop four-to-five months after surgery

3

in the "prototypic[al]" patient and "that appears to be what we have here" (doc. 10 at 3). Her reading of the record, however, prompted her to conclude that Dr. Hasan also opined that Plaintiff's increased pain and progressive loss of motion, indicative of chondrolysis, were more fully evident by the seven-to-eight month post-surgical mark. A period of seven months, of course, would occur before expiration of Plaintiff's insured status, while one of eight months falls just beyond "that critical date" and thus would be fatal to an award of benefits (id.). Such a discrepancy prompted her conclusion that remand rather than full reversal was appropriate, because, as required by Faucher v. Sec'y of Health & Human Servs., a "court can reverse the decision [of the Commissioner] and immediately award benefits only if all essential factual issues have been resolved and the record adequately establishes a plaintiff's entitlement to benefits." 17 F.3d 171, 176 (6th Cir. 1994) (emphasis added by the Magistrate Judge).

Plaintiff urges the Court to reject the Magistrate Judge's recommendation to remand and find instead that substantial evidence supports a finding of disability on December 19, 2007, which would be twelve (12) days prior to her date last insured (see doc. 12 at 2-4). Defendant Commissioner argues that it would be improper for us to consider such a result, inasmuch Plaintiff did not allege December 19 as her onset date either in

4

the hearing before the ALJ or in her Statement of Errors filed in support of her appeal to this Court (see doc. 17 at 2-3). Citing Swain v. Comm'r of Soc. Sec. as authority, she maintains that "[a] claim raised for the first time in objections to a magistrate judge's report is deemed waived." 379 F. App'x 512, 517-18 (6th Cir. 2010).

We disagree that Swain is apposite. The record is clear that the onset date originally alleged by Plaintiff was April 15, 2007 (Tr. 146 (Application for Disability Insurance Benefits dated March 31, 2009); Tr. 21, 23, 29 (ALJ's Decision)). Selection of this date seems logical as it was immediately before Plaintiff's first shoulder evaluation by Paul J. Favorito, M.D., the orthopaedic surgeon who then performed the fateful May 10, 2007 surgery when the pain pump was inserted (Tr. 600-06).[1] That Plaintiff wishes to focus the Court's attention on another date prior to her date last insured suggests no deceit;[2] moreover, it does not create a new issue. As the ALJ himself noted:

> There is an additional issue whether the insured status requirements of sections 216(i) and 223 of the Social Security Act are met. The Claimant's earnings record shows that the claimant has acquired sufficient quarters of

---

[1] This benchmark presumably accounts for Plaintiff's counsel's reference to an onset date of May 10, 2007 in his memorandum in support of his partial objection to the Magistrate Judge's Report and Recommendation (see doc. 12 at 1).

[2] Indeed, any later date claimed obviously works to Plaintiff's detriment and Defendant's benefit because, in the event of an award, Plaintiff would receive six less months of retroactive benefits.

> coverage to remain insured through <u>December 31, 2007</u> (hereinafter "the date last insured"). Thus, the claimant must establish disability <u>on or before that date</u> in order to be entitled to a period of disability and disability insurance benefits.
>
> After careful consideration of all the evidence, the undersigned concludes the claimant was not under a disability within the meaning of the Social Security Act <u>from April 15, 2007, through the date last insured</u>.

(Tr. 21 (emphasis added).) The issue framed was whether Plaintiff became disabled at any point between April 15, 2007 and December 31, 2007. Because the date of December 19, 2007 plainly falls within this time band, no additional evidence need be adduced. Thus, no new question has been presented.

Defendant Commissioner also argues that remand is appropriate because "there is some disagreement as to whether the procedure caused Plaintiff's shoulder to deteriorate to the point of disability" (doc. 17 at 3). We find this argument to be without merit as well. On April 9, 2008, after he examined Plaintiff for the second time after her January 11, 2008 surgery, Samer S. Hasan, M.D., Ph.D. did note that "[t]he pain pump is another potential culprit but again, this is no where as clear cut as we often see" and that "[Plaintiff] admits to smoking a half a pack a day or more of cigarette [sic] and that can confound healing" (Tr. 679). But in a comprehensive report dated July 9, 2009, in which he reviewed the totality of her medical and surgical records (including radiographic films and

6

arthroscopic images), he qualified his earlier observation and then offered a most unequivocal opinion with regard to the cause of Plaintiff's shoulder deterioration:

When I saw her on March 12, 2008, she was two months out following her index surgery and therefore, my examination was compromised by her immediate post-operative pain. I was reluctant to jeopardize her previous reconstruction since I did not have all of the records. Much of the examination was deferred and we asked that Ms. Schott return to see us which she did on April 9. . . .

At the April 9, 2008 visit, I felt that Ms. Schott's shoulder problems leading to her second surgery were likely multifactorial. The pain pump appeared to be a potential cause. I was concerned that she may have developed some recurrent instability as was justified with a revision labral repair. I recommended additional conservative treatment. Ms. Schott went on to see Dr. Angelo Colosimo for another opinion on June 10, 2008, [and] she underwent additional arthroscopic debridement. At this surgery, extensive arthritic changes were noted. I have the arthroscopic images that highlight this. There were no proud metal anchors that I am aware of. Dr. Colosimo felt that this was consistent with pain pump chondrolysis. She failed the arthroscopic debridement and underwent total shoulder replacement with Dr. Colosimo in 2008. This has been complicated by a traumatic subscapularis tear in the early post-operative period that has required two additional open surgeries. On May 30, 2009, when I saw Ms. Schott most recently, she was continuing to fare poorly and additional surgery was being contemplated.

Ms. Schott's shoulder deterioration mimics in many ways those we have seen previously in patients who develop chondrolysis with the use of an infusion pain pump delivering local anesthetics. As mentioned above, when I saw Ms. Schott in April 2008, I did have concerns that there might be confounding elements such as recurrent instability. However, because her subsequent records confirm extensive arthritic changes noted by Dr. Reihart[, t]hese changes cannot be explained by instability alone. That is to say, Ms. Schott's right shoulder arthritis advanced, or grade IV changes, involving more than a quarter of the glenoid surface between May 2007 and January 2008. It is also important to recognize that the chondral changes that Dr. Favorito identified at his initial stabilization were predominately involving the humeral head. There was no mention o[f] any chondral changes on

the glenoid.  Consequently, the advanced chondral changes noted by Dr. Reinhart represent a de novo process and rapid progression of some early arthritic changes . . . .The time line of about seven to eight months is classic for pain pump chondrolysis and has been noted previously by Dr. Matsen in his presentation to the American Academy of Orthopaedic Surgeons in February 2009.

Confounding variables need to be considered as well.  Dr. Favorito employed two BioKnotless anchors used to repair the anterior labrum.  BioKnotless anchors have been implicated in the development of chondrolysis . . . . However, the chondrolysis results when the anchors dislodge and become proud.  At Ms. Schott's second surgery by Dr. Reinhart in January 2008, there was no mention of anchor debris _____.  Secondly, Dr. Reinhart placed metal anchors at the second surgery, which also has been implicated in the development of chondrolysis, especially if the metal anchors dislodge and become proud. . . . However, proud anchors were not identified by Dr. Angelo Colosimo a[t] her subsequent arthroscopic debridement June 16, 2008.

Infection is clearly in the differential for any painful joint destruction following shoulder surgery.  However, Ms. Schott did not, and has not demonstrated a clinical pattern consistent with this.  This would have been covered at the time of her subsequent surgeries by Dr[s]. Reinhart and Colosimo or the total shoulder replacement performed by Dr. Colosimo in August 2008.  In fact, it is very unlikely that she would have undergone implantation of polyethylene metal prosthetic shoulder if infection had been in the differential.

Thus, it is within a reasonable degree of medical certainty that the cartilage loss and arthritis in Ms. Schott's right shoulder represents a case of chondrolysis caused by anesthetic drugs contained in the intra-articular pain pump used following her manipulation under anesthesia.

(Tr. 405-06.)  In April 2008, the first visit during which he could examine her after her first surgery, Dr. Hasan recalled that he was prepared to opine that Plaintiff's shoulder problems were "multifactorial," with the "pain pump appear[ing] to be a potential cause."  Yet in July 2009, privy to her treatment over

8

the past fifteen (15) months, he was able to eliminate certain "confounding variables" (other surgical devices such as BioKnotless and metal anchors) and infection as possible causes, and explicitly identified the pain pump inserted in May 2007 as the singular cause of her deteriorated right shoulder.

The Court has reprinted above only portions of Dr. Hasan's opinion, but there can be no doubt with regard to its thoughtfulness and thoroughness. His credentials as an expert are extensive (see Tr. 403-04, 407-24) and were not challenged by the ALJ at the hearing below or by Defendant Commissioner now on appeal. The Court has studied carefully his comprehensive analysis, and we also have reviewed the original treatment notes of the other physicians summarized within his opinion. Upon consideration, we believe the evidence establishing Plaintiff's disability prior to her date last insured is overwhelming.

The single-minded focus of the Commissioner on Dr. Hasan's mention that "[t]he time line of about seven to eight months is classic for pain pump chondrolysis" (Tr. 406), with the eighth month falling after December 31, 2007, is grossly misplaced. Dr. Hasan attributed the parameters of this time line to a Dr. Matsen, a presenter at a February 2009 meeting of the American Academy of Orthopaedic Surgeons. Specific to Plaintiff, however, was Dr. Hasan's opinion that pain pump-induced chondrolysis tends to develop four-to-five months after surgery in the

"prototypic[al]" patient and "that appears to be what we have here" (Tr. 683 (emphasis added)). Try as the Court might, it cannot find anywhere on that same page of the transcript that Dr. Hasan modified his view that Plaintiff's "pain and loss of motion were more fully evident by the '7-8 month post-surgical mark'" as Defendant maintains in her brief urging us to accept the Magistrate Judge's recommendation for remand (see doc. 17 at 4). Rather, the only reference to a seven-to-eight month time line that the Court can locate is the one attributed to Dr. Matsen by Dr. Hasan in his July 2009 extensive narrative opinion in which he makes it absolutely clear that the shoulder problems for which he examined Plaintiff in April 2008 were not multifactorial, but the direct result of pain pump chondrolysis (see Tr. 405-06). And, again, as earlier quoted, in April 2008 Dr. Hasan opined that the symptoms of which Plaintiff complained, and which resulted in her second surgery by Glenn A. Reinhart, M.D. in January 2008, began to occur within four-to-five months after her first surgery performed by Dr. Favorito in May 2007, at which time the pain pump was inserted. Four-to-five months after May 10, 2007 obviously falls before December 31, 2007, her date last insured. So, too, does the revised onset date Plaintiff proposes, December 19, 2007. It was on this date that Dr. Reinhart discussed with Plaintiff the need for a second surgery

10

that was scheduled for and occurred in January 2008.  We review
Dr. Reinhart's records of Plaintiff's pre-surgery visits below.

Plaintiff first consulted with Dr. Reinhart on November 28,
2007.  His treatment notes from that visit read as follows:

[The patient] underwent surgery in May 2007 by Dr. Favorito for
arthroscopic Bankart repair.  Following surgery she initially did
well for several months with a period of physical therapy but
recently she developed severe and increasing symptoms with severe
pain in her shoulder to the point where she is hesitant to raise
her arm away from her body.  She has a feeling of slipping, or
grinding or popping in her shoulder which occurs any time she
attempts to move it.  Much of her pain is felt over the posterior
shoulder.  She also has some anterior shoulder pain as well as
pain radiating down her arm. . . . She has not suffered any new
injuries.  The symptoms have been severe enough that she is
currently using a sling.  She states when she leans forward and
lets her arm hang down it feels like it completely drops out of
the socket.

(Tr. 339 (emphasis added).)  Dr. Reinhart noted a number of
possible diagnoses and ordered an MRI scan to better hone his
assessment.  He also recommended that Plaintiff continue to use a
sling, prescribed a Medrol dosepak for inflammation[3] and Vicodin
for pain, and asked her to return in seven-to-ten days (id.).

At her December 5, 2007 follow-up visit, Plaintiff reported
continued "persistent" pain and a continued feeling of a
"clicking or popping sensation in the shoulder especially when
she leans forward and lets her arm hang" (Tr. 338).  The MRI scan
lessened Dr. Reinhart's concern that her previous surgical
implants had dislodged, but because of her "rather sudden onset

---

[3] Medrol Dosepak (methylprednisolone), http://www.drugs.com (last
visited Nov. 5, 2013).

of rather severe symptoms," he narrowed his diagnostic focus to "synovitis if there is dissolving material from her bioabsorbable implants verses [sic] possible capsulitis following [her] previous surgery" (Tr. 337). Continuing, he stated, "I do not think she has true anterior instability. She may have some element of posterior or inferior instability which could be causing her glenohumeral inflammation" (Id.). Dr. Reinhart gave her a steroid injection, directed continued use of a sling, and prescribed Ultram try to instead of Vicodin (which made Plaintiff nauseous) for pain and Voltaren for anti-inflammatory effect. He concluded with this observation and comment:

The patient is quite upset today and wants her previous surgery "undone". I tried to explain to her that it will take several steps to truly identify the source of her pain and I would attempt a full course of conservative treatment before considering any additional surgery.

(Id. (emphasis added).)

Plaintiff returned again to see Dr. Reinhart on December 19, 2007. His note memorializing Plaintiff's history since her last visit reads:

The patient continues to have a feeling of grinding or popping and slipping at her posterior superior shoulder. When she relaxes and lets her arm hand [sic] at her side, she feels like something shift[s] in/out of place or separates at her shoulder joint. She is not having as much superior pain or lateral arm pain. She does not complain of any significant anterior shoulder pain. She localizes pain in the posterior and superior shoulder. There is no numbness, tingling, or weakness in her arm. No pain at her neck. However, when she does get tired or attempts to use her arm for anything strenuous, she feels like she has pain that radiates down the entire arm and the entire arm starts to tingle.

<u>She uses a sling part-time</u>. <u>She has been taking Vicodin regularly with partial relief</u> of her symptoms.

(Tr. 336 (emphasis added).)[4] Within his treatment plan notes he observed that Plaintiff's "[s]ymptoms are consistent during the course of her examination and consistent with her history and description of her complaints. She seems to have an intra-articular problem which is causing pain at the posterior superior quadrant of her shoulder and is related to positioning of her arm" (Tr. 335). He posited four different causes of her pain, gave her another steroid injection, and advised her that she needed arthroscopy "to make a complete evaluation and diagnosis

---

[4]The Magistrate Judge found that this clinical record did not "as strongly support Plaintiff's claimed disability date [of April 15, 2007]," focusing on the excerpts describing that Plaintiff wore a sling only "'part-time'" and Vicodin provided "'partial relief'" of her symptoms, as well as Dr. Reinhart's observations that Plaintiff "'does not complain of any significant anterior shoulder pain,' but only of localized pain 'in the posterior and superior shoulder,' with 'no numbness, tingling, or weakness in her arm.' Only when using her arm for 'anything strenuous' did Plaintiff experience radiating pain at that point in time" (see doc. 11 at 2). With due respect, we differ with the Magistrate Judge's interpretation. These excerpts are not representative of Dr. Reinhart's observations as a whole, which describe a patient in need of radical treatment—further surgery—to understand the root cause of her extreme pain. But even taken out of context, to us they do not necessarily depict an individual without a disability. Localized pain in one section of the shoulder as opposed to another does not connote a lesser level of pain; moreover, Plaintiff consistently had complained of more pain in the posterior section of her shoulder rather than the anterior portion. Further, to need to wear a sling at all, or to take a Schedule III narcotic <u>regularly</u> only to achieve <u>partial</u> relief, or to experience radiating pain when tired or when engaging in strenuous activity, does not prompt us to question the severity of Plaintiff's impairment or her incapacity to work.

of her shoulder problem" and further surgeries "to repair any
damaged soft tissue" and "to stabilize her shoulder more
effectively" (Id.).  Thereafter, four procedures were performed
by Dr. Reinhart on January 11, 2008, specifically right shoulder
arthroscopy with repair of SLAP lesion; right shoulder
arthroscopy with repair of posterior capsule; right shoulder
arthroscopy with chondroplasty of the glenoid; and right shoulder
open anterior capsule labral reconstruction with inferior
capsular shift (see Tr. 291, 333).  An excerpt of his operative
report is set forth below:

The right shoulder was examined under anesthesia.  The patient
had previously undergone surgery for stabilization, but on
examination, her shoulder had multidirectional instability.  It
could be dislocated posteriorly.  It could be dislocated
inferiorly and had increased anterior translation compared to her
opposite shoulder. . . .  There was significant wear on the
glenoid surface especially anteriorly inferiorly where the bone
anchor had previously been placed for the patient's prior
procedure.  The anterior inferior quadrant of the glenoid was
basically loose flaps of cartilage and these were subsequently
debrided so that there was a large area of bare bone involving
about 25% of the anterior inferior glenoid surface.  There was
also some[]where at the posterior inferior glenoid surface, which
was debrided back to stable margins eventually which also left a
grade IV lesion. . . .  The superior labrum could easily be
detached and completely lifted away from the glenoid from the 11
o'clock position to the 1 o'clock position.  There was some
tearing at the base of the biceps.  The anterior inferior labrum,
which had previously been repaired, had several sets of sutures,
which had fixed the anterior inferior glenoid to the biceps
across the suture line, however, when probing the anterior
inferior labrum, there was no significant healing between the
labral tissue in the glenoid rim and the labrum could actually be
lifted away from the glenoid except []at the points w[h]ere the
sutures were in place.  The decision was made to proceed with
arthroscopic stabilization of the superior labral lesion at the
base of the biceps.

14

(Tr. 292 (emphasis added).) Clearly, significant deterioration had occurred since Plaintiff's first surgery immediately after which the pain pump was inserted.

During her first post-operative follow-up visit to his office, Dr. Reinhart recorded these remarks:

The patient is 12 days following <u>extensive surgery on her right shoulder</u>. <u>At the time of surgery, she was noted to have multidirectional instability</u>, as well as <u>arthritis</u>. The instability was addressed with repair of a SLAP lesion as well as anterior and posterior capsular shifts through a combined arthroscopic and open technique. <u>She has severe pain</u>. <u>She is using a sling full-time</u>, but does not complain of any slipping or popping like she had prior to surgery. <u>She did have significant arthritis at the time of her arthroscopic evaluation</u>. There are <u>no problems related to her previous hardware</u>.

(Tr. 333 (emphasis added).) Without a doubt, Plaintiff had been experiencing considerable pain well before November 28, 2007, the date of her first visit with Dr. Reinhart when she sought a second opinion regarding her shoulder. That visit, along with the next two, during which Plaintiff received steroid injections and was prescribed different oral medications, were all part of Dr. Reinhart's attempt to treat her complaints of pain conservatively and to avoid surgery. As he cautioned Plaintiff on December 5, 2007, "it will take several steps <u>to truly identify the source of her pain</u>" and he planned "<u>a full course of conservative treatment before considering any additional surgery</u>" (Tr. 337 (emphasis added)). That Dr. Reinhart waited to recommend surgery until he was convinced of its absolute

15

necessity does <u>not</u> suggest that Plaintiff's shoulder had not yet deteriorated to the point of disability prior to her last date insured.  It suggests only a responsible medical process of elimination.  The Court agrees with Plaintiff that it defies logic to entertain the notion that "significant wear on the glenoid surface especially anteriorly inferiorly where the bone anchor had previously been placed for the patient's prior procedure" (Tr. 292), or "no significant healing between the labral tissue in the glenoid rim and the labrum could actually be lifted away from the glenoid except []at the points w[h]ere the sutures were in place" (<u>id.</u>), or "significant arthritis" (Tr. 333), somehow developed between January 1 and January 11, 2008.

Additional evidence supporting disability onset as of December 19, 2007 is found within the treatment notes of Angelo J. Colosimo, M.D., who first saw Plaintiff on May 15, 2008, some four months following her second surgery performed by Dr. Reinhart.  His narrative regarding Plaintiff began as follows:

<u>Ms. Schott was able to provide an accurate history in which she had suffered an injury to her shoulder, underwent surgery by Dr. Paul Favorito on 5/10/2007.  After this surgical repair, an indwelling intra-articular pain pump was placed.  At approximately three weeks post-surgery, she noticed a progressive tightness and increased pain in her shoulder, as this continued to progress causing her loss of activity of daily living (ADL) capability with the shoulder, secondary to both the pain and the loss of motion.  She also states that she had a very difficult time with developing her strength in order to utilize her shoulder with any type of lifting activity.</u>

16

She underwent a second surgery by Dr. Glenn Reinhar[]t who,
according to the patient, performed an arthroscopic debridement,
secondary to severe chondrolysis within the right shoulder, on
1/11/2008.  He apparently did a labral repair and a capsular
shift because she continued with instability complaints.

(Tr. 432-33) (emphasis added).)  After viewing x-rays and an MRI

scan, he stated "[o]ur initial impression is that Ms. Schott

developed gleno-humeral chondrolysis secondary to the use of the

intra-articular pain pump.  Her options based on the current

findings required further surgical intervention" (Tr. 433

(emphasis added)).  On June 16, 2008, Dr. Colosimo performed a

right shoulder arthroscopy with chondroplasty of the gleno-

humeral joint, limited synovectomy and bursectomy, and a

manipulation.  He then opined, "Based on the patient's history

and my observations during surgery of the diffuse loss of

cartilage, it was clear to me that the continuous infusion of

local anesthetic via the pain pump had significantly contributed

to her development of chondrolysis" (Id. (emphasis added)).  Dr.

Colosimo operated again on Plaintiff's right shoulder on March 6,

2009.  His July 15, 2009 overview, written following a post-

operative visit for that second surgery, is instructive:

Ms. Schott's shoulder progression is consistent with a complex
series of events associated with the use of a high-flow infusion
pain pump for anesthetic purposes.  Development of the
chondrolysis, synovitis, and resultant adhesive capsulitis can be
related back to the post-surgical management of Ms. Schott from
May 10, 2007.  This patient . . . is documented to have perceived
instability and laxity secondary to failure of conservative
management.  An arthroscopic Bankhart repair was performed, and a
limited debridement of the shoulder was performed.  At the time

17

of the original surgery there was minimal change to the
glenohumeral articular surfaces. Post-surgically this patient
states that at approximately 3 weeks post-surgery, progressive
pain, increased motion loss, decreased ADL capability, and
crepitation started to occur and continued to occur at an
increasing rate until a second physician treated her for the
motion loss.

At this time, Ms. Schott has undergone multiple surgeries
secondary to the complication of chondrolysis resulting in a
degenerative sequence of events. This patient faces a very
difficult future with prognosis for multiple surgeries and
therapeutic intervention. Ms. Schott's limitations on ADL with
her upper extremity is permanent.

(Tr. 435 (emphasis added).)

It is true that Dr. Colosimo began his treating relationship
with Plaintiff after her date last insured. Nonetheless, his
assessment that pain pump chondrolysis had progressed
sufficiently after Plaintiff's initial May 10, 2007 surgery to
require a second surgery in January 2008, which was recommended
to her by Dr. Reinhart on December 19, 2007, before her last date
insured, deserves attention. As with Dr. Hasan, Dr. Colosimo's
qualifications as an expert are substantial (see Tr.431-32, 437-
59) and were not challenged by the ALJ at the hearing below or by
Defendant Commissioner now on appeal. Indeed, as earlier
referenced, the ALJ's only hesitation to find Plaintiff disabled
under the statute centers around the lack of an opinion
identifying a precise date certain of when "use of her right
shoulder [became] substantially compromised" (Tr. 27). For
example, in assigning a functional capacity assessment, the ALJ

18

remarked, "[t]he claimant's vocational expert estimated that the claimant would not have been able to work from her May 2007 surgery forward, but he based his findings on Dr. Hasan's functional assessment, <u>which included no mention of claimant's disability date</u>.   Accordingly, the vocational assessment is afforded little weight" (Tr. 28 (emphasis added)).   In the Court's view, however, the evidence before the ALJ distinctly compelled the inference that sufficient degeneration had occurred before December 31, 2007, Plaintiff's last date insured. Plaintiff consistently complained of severe pain and slipping, grinding, and popping within her right shoulder, and conservative treatment measures were ineffective.   The classic pattern of pain pump-induced chondrolysis was identified by a treating surgeon as well as a consultative expert.   No expert has offered testimony to the contrary.   We cannot help but conclude that the disabling degenerative damage to Plaintiff's right shoulder unmistakably occurred well before December 31, 2007, her last date insured, or even December 19, 2007, the date Plaintiff asks the Court to establish as her onset of disability.   We do not regard our pronouncement as an impermissible substitution of our own medical judgment, but rather as an acknowledgement of the overwhelming evidence before us in the record.

As required by 29 U.S.C. § 636(b) and Federal Rule of Civil Procedure 72(b), the Court has reviewed the determination of the

Magistrate Judge and considered de novo the filings in this matter. As detailed above, read in a sequence and as a whole, the treatment notes of Drs. Reinhart and Colosimo, combined with the expert consultative digest of Dr. Hasan, make clear to the Court that Plaintiff's shoulder had deteriorated long before her second surgery in January 2008. Thus, we conclude that substantial evidence does not support the ALJ's findings that, through her date last insured, Plaintiff did not have an impairment that met or medically equaled one of the listed impairments in 20 C.F.R. § 404, Subpart P, Appendix 1, specifically Listing 1.02, and that Plaintiff had the residual functional capacity to perform less than a full range of light work. Under such circumstances, the Court finds that any further delay would not serve the interests of justice. Rather, where, as here, the proof of disability is strong and the evidence to the contrary is lacking, the Court finds that an immediate award of benefits to Plaintiff is appropriate. Faucher, 17 F.3d at 176 (6th Cir. 1994). In such a case as this, "it is well to bear in mind" that, "[t]he Social Security Act is a remedial statute" that "must be 'liberally applied.'" Cohen v. Sec'y of Health & Human Servs., 964 F.2d 524, 531 (6th Cir. 1992).

In sum, the Court SUSTAINS Plaintiff's Partial Objection to the Magistrate Judge's Recommendation (doc. 12); REJECTS the Magistrate Judge's Recommendation (doc. 11); REVERSES the

20

decision of the ALJ pursuant to 42 U.S.C. § 405(g); and ENTERS Final Judgment in favor of Plaintiff Dianna Schott, finding that she is entitled to disability insurance benefits as of December 19, 2007. The Court AWARDS Plaintiff Dianna Schott disability insurance benefits based on that date and REMANDS this matter to Defendant Commissioner of Social Security for an immediate award consistent with this Opinion and Order. Finally, we Order that this matter be CLOSED on the Court's docket.

       SO ORDERED.


Dated:  December 4, 2013  s/S. Arthur Spiegel_____
                          S. Arthur Spiegel
                          United States Senior District Judge